# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>AN APPLE IPHONE RECOVERED FROM DEFENDANT<br>CHRISTOPHER YOUNG, CURRENTLY LOCATED AT<br>5002 HAYES ST NE, WASHINGTON, DC 20019<br>UNDER RULE 41 | )<br>)<br>)<br>)    Case No.  19-sw-250<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A  incorporated herein and included as part of this Application for a Search Warrant.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the attached Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2422(b) | Coercion and Enticement of a Minor. |
| 18 U.S.C. § 2251(a) | Production of Child Pornography. |
| 22 D.C.C. § 3008 | First Degree Child Sexual Abuse. |

The application is based on these facts:

See Attached Affidavit in Support of Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Alix Skelton, S/A, FBI/WFO/CR18
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _____07/03/2019_____

_____
*Judge's signature*

City and state:  __Washington, D.C.__

Deborah A. Robinson, United States Magistrate Judge
_____
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.   19-sw-250 |
| AN APPLE IPHONE RECOVERED FROM DEFENDANT | ) |
| CHRISTOPHER YOUNG, CURRENTLY LOCATED AT 5002 | ) |
| HAYES ST NE, WASHINGTON, DC 20019 | ) |
| UNDER RULE 41 | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ Columbia
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A  incorporated herein and included as part of the Application for a Search Warrant.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit.

**YOU ARE COMMANDED** to execute this warrant on or before _____ July 16, 2019 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Deborah A. Robinson _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      07/03/2019 at _____      _____
                                                                                       *Judge's signature*

City and state:      Washington, D.C. _____      Deborah A. Robinson, United States Magistrate Judge
                                                                                       *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>  19-sw-250 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|
|  |

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is an Apple i-Phone recovered from defendant Christopher Young, D.O.B ████████, at the time of his arrest on June 26, 2019 at 200 I Street, Southwest, Washington, D.C., hereinafter the "Device."  The Device is currently located at 5002 Hayes Street, N.E., in Washington, D.C. 20019.

## ATTACHMENT B

*Property to be seized*

1.       The items, information, and data to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 United States Code Section 2422(b), Coercion and Enticement of a Minor, 18 United States Code Section 2251(a), Production of Child Pornography, and First Degree Child Sexual Abuse pursuant to 22 D.C. Code Section 3008,  as described in the search warrant affidavit, including, but not limited to:

   a.   Records and information relating to the June 24-25, 2019 sexual assault and coercion/enticement of the complaint;

   b.   Records and information relating to messages sent to/from the complainant;

   c.   Records and information relating to photographs taken of and/or recordings made during the sexual assault of the complainant;

   d.   Records and information relating to messages sent by defendant YOUNG to the unidentified SENDER of the other messages;

   e.   Records and information related to Applications downloaded to and utilized on the Device;

   f.   Records and information relating to the identity of the unidentified SENDER;

   g.   Records and information containing any pornographic images of the complainant or other children, taken on or received by the Device;

   h.   Records and information that constitute evidence of the state of mind of YOUNG, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

i.  Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with YOUNG about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

j.  Evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

k.  Evidence of software, or the lack thereof, that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

l.  Evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

m.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device;

n.  Evidence of the times the Device was used;

o.  Passwords, encryption keys, and other access devices that may be necessary to access the Device;

p.  Documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device;

q.   Records of or information about Internet Protocol addresses used by the Device; and

r.   Records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: AN APPLE IPHONE RECOVERED FROM DEFENDANT CHRISTOPHER YOUNG, CURRENTLY LOCATED AT 5002 HAYES ST NE, WASHINGTON, DC 20019 UNDER RULE 41 | SW No. 19-sw-250 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Special Agent Alix Skelton, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I, Alix Skelton, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

2.      I have been employed as a Special Agent of the FBI since December 2011 and am currently assigned to the Washington Field Office, Child Exploitation and Human Trafficking Task Force, at the Northern Virginia Resident Agency. While employed by the FBI, I have investigated federal criminal violations related to cybercrime, child exploitation, and child pornography.  I have gained experience through training by the FBI and everyday work relating to conducting these types of investigations. I have also been the Affiant for and participated in the execution of several federal search warrants in child sexual exploitation investigations.

3.      As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

4.      This affidavit is made in support of a search warrant, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to search the Apple iPhone, recovered from defendant Christopher Young on June 26, 2019 at 200 I Street, Southwest, Washington D.C., hereinafter referred to as the

"Device", further described in Attachment A, for the things described in Attachment B, where

your affiant believes evidence of violations of Title 18, United States Code, Sections 2422(b),

Coercion and Enticement of a Minor; Title 18, United States Code, Section 2251(a), Production

of Child Pornography; and 22 D.C. Code Section 3008, First Degree Child Sexual Abuse.

5.      The statements contained in this affidavit are based upon my investigation,

information provided by other law enforcement officers, other personnel specially trained in the

seizure and analysis of computers and electronic media, and on my experience and training.

Because this affidavit is being submitted for the limited purpose of securing a search warrant, I

have not included each and every fact known to me concerning this investigation.  I have set

forth only the facts that I believe are necessary to establish probable cause to believe that

evidence of violations of Title 18, United States Code, Sections 2422(b), Coercion and

Enticement of a Minor; Title 18, United States Code, Section 2251(a), Production of Child

Pornography; and 22 D.C. Code Section 3008, First Degree Child Sexual Abuse, exists at the

account to be searched.

## **PROBABLE CAUSE**

6.      On June 25, 2019, detectives from the Metropolitan Police Department ("MPD")

Youth and Family Services Division received a referral from an officer at First District Station in

regards to a 10-year-old female child who had been sexually abused during the evening hours on

June 24, 2019 at her home in Northeast Washington, D.C. by the defendant, Christopher Young

(hereinafter "YOUNG") a twenty-eight year-old male.   The complainant reported to law

enforcement that she had had to perform fellatio on YOUNG's penis two times. YOUNG is

Witness 1's boyfriend, whom the complainant refers to as her "stepdad."   The officer to whom

2

complainant reported contacted the Youth and Family Services Division at MPD and a detective was sent to speak with the complainant and Witness 1.

7.     Detectives with MPD interviewed the complainant's mother, herein "Witness 1." Witness 1 reported that when she went to sleep the night of June 24, 2019, the complainant and her younger sister were sleeping in their bedroom.  Witness 1 reported that something told her to get up, and when she went to the living room, she saw the complainant and YOUNG sitting on the sofa.  Both of them were on their cell phones. Witness 1 reported that YOUNG stated to her words to the effect of, "Boo you need to get to the bottom of this because somebody texted her phone and shit has gone too far now."   Witness 1 reported she asked the complainant for her cell phone, which the complainant provided.  Witness 1 then began to look at the text messages from the unidentified number to complainant.

8.      Witness 1 reported that the unknown sender of the messages told the complainant to perform sexual acts on her step dad, YOUNG. Witness 1 reported that she believed that the person sending the messages to the complainant was YOUNG, posing as an unknown female by sending the messages using a messaging application that generates a telephone number within the application.

9.     Witness 1 reported that the number used to send the messages was, ███████ ███.[1]  Witness 1 reported that she attempted to call the number to see if a child answered the phone, but received an automated voicemail message.

_____

[1] An analyst with the FBI subsequently identified the third party messaging application to which the number belonged as the application "Pinger."

10.     Witness 1 showed the text messages on the complainant's cellular phone to a Detective with MPD, and reported that the unidentified sender of the messages was threatening the complainant that the sender would expose inappropriate pictures to Witness 1 and other family members. According to Witness 1, the text messages from the unknown caller stopped when Witness 1 left the home to file a police report, and after Witness 1 told YOUNG to leave Witness 1's home.

11.     Witness 1 reported that the complainant initially denied that YOUNG had done anything to her while in YOUNG's presence.  Witness 1 reported to the MPD detective that, after she separated the complainant from YOUNG, she asked the complainant if YOUNG did anything else to her, in response to which the complainant told Witness 1 that she had performed fellatio on YOUNG.

12.     Witness 1 further reported that YOUNG sent Witness 1 text messages from the Device saying that YOUNG did not do anything to the complainant. Specifically, Witness 1 showed law enforcement text messages from YOUNG, a portion of which stated:

<u>YOUNG</u>:  But believe me I ain't do nuthn to her

<u>YOUNG</u>:  Yu want me locked up tho I'm hip[2]

<u>YOUNG</u>:  Trust me I kno

---

[2] All text abbreviations and typographical errors in quoted text language are original.

13.     Witness 1 provided law enforcement with written consent to search the complainant's cellular phone. A preliminary forensic review of the complainant's phone revealed a series of text messages between the complainant and the unidentified sender from cellular phone number ███████████ (herein "SENDER"). The messages stated as follows:

SENDER:  Hey

SENDER:  He said you haven't told him.  Maybe I should call mom

SENDER:  Hey.  Sd[3] said you haven't said anything

  COMPLAINANT:  I forgot what to tell him plz don't call my mom

  COMPLAINANT:  I'm going to sleep I'll tell him tomorrow

SENDER:  No

  COMPLAINANT:  I'm in the bed already

SENDER:  I asked him were you sleep

SENDER:  He said he in living room

  COMPLAINANT: I'm not sleep yet

SENDER:  Ok well I'll txt mom in a few minutes

  COMPLAINANT:  No

SENDER:  She sounds upset already

SENDER:  I called blocked

SENDER:  Before 12am tell him or I'm making the call.  And you lied and said you were gon txt me cause your phone died

SENDER:  If you go do it for 10 seconds he can take the pic I already told him

_____

[3] "Sd" refers to "step-dad"

5

COMPLAINANT:  My phone did die

COMPLAINANT:  I didn't lie

COMPLAINANT:  And why you want me to do it so bad

SENDER: Ok. Did you read my text

SENDER:  Ok I'll just send these to mom

COMPLAINANT:  Why do you want me to do it so bad

SENDER:  It's fun. After that you won't hear from me I told you

SENDER:  Did you like what he did if he even did it

COMPLAINANT:  No

SENDER:  No what

COMPLAINANT:  I'll do it tomorrow I'm trying to go to sleep

SENDER:  Time is ticking

SENDER:  Okay mom will get these in a few minutes

COMPLAINANT:  No

SENDER:  Wait who is m█

COMPLAINANT:  Why

SENDER:  I heard mom say his name

COMPLAINANT:  My uncle

SENDER:  His number look like yours so I aksed

COMPLAINANT:  Ok

SENDER:  Wow so should he get these or mom

SENDER:  Maybe both

COMPLAINANT:  He in do you have his number

6

SENDER:  From mom. But all you have to do is that for 10seconds

    COMPLAINANT:  Do you mom gave you his number

SENDER:  He won't say anything he said he jus want to help you get out of this

    COMPLAINANT:  I won't to get out of this

    COMPLAINANT: My mom gave you my uncle number

SENDER:  Your mom did. She don't know what kind of pictures they are I jus let told her you sent them

SENDER:  Ok go do your 10 seconds

    COMPLAINANT:  You told her

SENDER:  He said he bout to change

    COMPLAINANT:  Ok

SENDER:  No not really I just said we talk and we send pictures she said she want to see

    COMPLAINANT:  Don't send them to her

SENDER:  Go do your 10 seconds after he change. He really want to help you so let him

    COMPLAINANT:  Can I do something else other than sex stuff with my step dad

SENDER:  It's almost 12

SENDER:  Say sd

    COMPLAINANT:  Say what

SENDER:  Nothing. I just text him

    COMPLAINANT:  Can I do something else

SENDER:  Yea you can let him do 10seconds!

SENDER:  9:51 time is ticking

    COMPLAINANT:  Do what for 10 seconds

7

SENDER:  What he do last time

    COMPLAINANT:  He told you what he did last time

SENDER:  Yes. I asked him

    COMPLAINANT:  And I said other than sex stuff with him

SENDER:  Nope.

SENDER:  How bout I just send them and get it over with

    COMPLAINANT:  No

    COMPLAINANT:  And we did it so why I got to do it again

SENDER:  Ok. 10 seconds you or him

SENDER:  I ain't see a pic so how do I know he ain't lie

SENDER:  So what's up

    COMPLAINANT:  We not on god.  No crosses counted

SENDER:  I made sure he won't say anything. Will you

    COMPLAINANT:  On god we did it

    COMPLAINANT:  No

SENDER:  Ok so it should be easy this time then

    COMPLAINANT:  But why again if I said on god

SENDER:  Don't make sd wait jus go get it over with

    COMPLAINANT:  Ok

SENDER:  I'm sending 1 picture at a time

    COMPLAINANT:  No

SENDER:  He said what happen

    COMPLAINANT:  He had the light off so I couldn't see

8

SENDER:  I'll tell him.

COMPLAINANT:  Ok

COMPLAINANT:  Why do I got to do this again

SENDER:  at your bathroom

SENDER:  Or in it like you're using it

COMPLAINANT:  He not in my bathroom

SENDER:  He waiting for my text.

SENDER:  Where's mom

COMPLAINANT:  In her room

SENDER:  Ok so 10 sucks

SENDER:  Go

COMPLAINANT:  He not in there

SENDER:  He said he is

COMPLAINANT:  Ok

COMPLAINANT:  I did it

SENDER:  I thought he was doin it

COMPLAINANT:  No I did it

SENDER:  Yayyyy girly.

SENDER:  How you feel

COMPLAINANT:  No is it over

SENDER:  Yup last thing and that's it

COMPLAINANT:  I got a headache and I'm sleepy

SENDER:  Poor baby

9

COMPLAINANT:  It was the last thing

SENDER:  Nope. I don't need a picture for this one. But I will kno if you lying

COMPLAINANT:  He got the picture

COMPLAINANT:  Ok

SENDER:  He sent it.

COMPLAINANT:  Ok

SENDER:  The last thing is

COMPLAINANT:  But delete it now you see

COMPLAINANT:  Screen shot that you deleted it

SENDER:  I deleted them except for 1

COMPLAINANT:  Delete all

SENDER:  Because you have 1 more thing

COMPLAINANT:  What is it you said that was the last thing

SENDER:  I have 1 picture left

SENDER:  You ready

COMPLAINANT:  Delete them all and you said that was the last thing

SENDER:  Sd have to put a finger in you for 30 seconds or you do what you did for 20

COMPLAINANT:  You said that was the last thing

SENDER:  He said can he just kiss it again though

COMPLAINANT:  No he didn't screenshot him saying that

SENDER:  That was the last thing to do so I can erase all pics now you have 1 pick and 1 more task

COMPLAINANT:  Screenshot him saying that

<u>SENDER</u>:  I erase all text! Want me to tell him tell you

    <u>COMPLAINANT</u>:  No

    <u>COMPLAINANT</u>:  I don't believe you I don't think he said that

<u>SENDER</u>:  You thought he was lyin though

    <u>COMPLAINANT</u>:  He didn't say that

<u>SENDER</u>:  I'm trying to make him say it again

    <u>COMPLAINANT</u>:  He didn't say it

    <u>COMPLAINANT</u>:  So what I did was the last thing my head hurts

<u>SENDER</u>:  The last thing.  He insert a finger for 30 seconds or you do it again but for 20 seconds

    <u>COMPLAINANT</u>:  No

<u>SENDER</u>:  No what

    <u>COMPLAINANT</u>:  My head hurts and he said if I want to do it and I don't

<u>SENDER</u>:  Ok I don't want to send the only pussy pic of you to your mom but I may have to

    <u>COMPLAINANT</u>:  I don't want to do nothing else my head hurts can you understand my head hurts

<u>SENDER</u>:  Yes. Ok I'll send it goodnight

    <u>COMPLAINANT</u>:  Good night

<u>SENDER</u>:  Your mom got the pic yet

<u>SENDER</u>:  I'm about to send it

    <u>COMPLAINANT</u>:  I don't know

    <u>COMPLAINANT</u>:  She got them I'm in trouble now it's over now that I'm in trouble right

<u>SENDER</u>:  I haven't sent it

SENDER:  I was wondering should your uncle m███ get them first

    COMPLAINANT:  No just send them to my mom

    COMPLAINANT:  ☐☐

SENDER:  And I will send the one of you and sd

SENDER:  Ok

    COMPLAINANT:  To my mom

SENDER:  To everyone

    COMPLAINANT:  No

SENDER:  She gave me somebody name j███[4] number

SENDER:  Your sd love you. He is begging me to leave you alone. I told him what you need to do last! He said ok

SENDER:  See how I erased stuff. I kept my word and this the last pic. All yours erased now it's just the one he sent

SENDER:  ?

    COMPLAINANT:  I'm sleepy can you just send them to my mom and get it over with plz don't send it to my uncle or J███

SENDER:  Maybe I'll send it to m██ n j███

    COMPLAINANT:  No

SENDER:  Mom phone went to voicemail like I'm blocked

    COMPLAINANT: You not blocked one her phone

    COMPLAINANT:  Try to call her again

SENDER:  I have to do it on my computer

---

[4] The complainant identified "J███" as her biological father's name.

COMPLAINANT:  Call he

COMPLAINANT: On your computer

SENDER:  I just texted her

SENDER:  She said you in your room

SENDER:  She bout to tell you something

SENDER:  I told her we have pix from field day lol

SENDER:  Next I'm sending

COMPLAINANT: Ok

SENDER:  So what you gone do

COMPLAINANT:  Yes

SENDER:  Yes what

SENDER:  J█████ texted me back

SENDER:  I'm about to send him your pic lol

COMPLAINANT:  No

SENDER:  A look. M██ just asked who is this

COMPLAINANT:  I'll do

COMPLAINANT:  I'll do it tell them rong

COMPLAINANT:  Rong number

COMPLAINANT:  Plz I'll do it

SENDER:  Ok

COMPLAINANT:  Did you text them rong number

COMPLAINANT:  Hello

SENDER:  Yes

13

<u>COMPLAINANT</u>:  I did it

<u>COMPLAINANT</u>:  Hello

<u>SENDER</u>:  Ok I'm texting him

<u>COMPLAINANT</u>:  Who

<u>COMPLAINANT</u>:  My step dad

<u>COMPLAINANT</u>:  Hello

<u>COMPLAINANT</u>:  Who

<u>SENDER</u>:  Sd

<u>COMPLAINANT</u>:  My step dad

<u>COMPLAINANT</u>:  Hello

<u>SENDER</u>:  It's sd. Learn to speak in code!

<u>COMPLAINANT</u>:  Ok

<u>COMPLAINANT</u>:  He got the picture

<u>SENDER</u>:  Hey I got the picture but it's da same thing yu did the first time are you trying to play me

<u>COMPLAINANT</u>:  No

<u>SENDER</u>:  Maybe I should be textin █████

<u>COMPLAINANT</u>:  I did it again on god

<u>COMPLAINANT</u>:  I did it in the living room this time

<u>SENDER</u>:  He was supposed to do wat he did not you

<u>SENDER</u>:  I think y'all playin me

<u>SENDER</u>:  Now ████ keep callin me

<u>SENDER</u>:  What should I say now

14

COMPLAINANT:  Say I had the rong number

COMPLAINANT:  Did you say my name when you text him

SENDER:  I told him that.

SENDER:  Yea I did

SENDER:  Lol I told him I have a pic for him from you

COMPLAINANT:  Say I'm looking for a C███ Smither

SENDER:  He already said you his daughter

SENDER:  So what the fuck y'all doin

SENDER:  Playing

COMPLAINANT:  Say never mind I deleted the picture Field day

SENDER:  Tell him he owe me 30 seconds to you or I'm sending

COMPLAINANT:  What you mean ok

SENDER:  I didn't kno j███ was your father

COMPLAINANT:  Yes now I'll do it for 30 seconds

SENDER:  You will or he will

COMPLAINANT:  Now tell him you deleted the pictures from Field day today of us to

COMPLAINANT:  I will

COMPLAINANT:  Now did you say that

COMPLAINANT:  Hello

SENDER:  I'm not deleting yet. Make him nut and it's over

COMPLAINANT:  I'm going to do him aging is it ok

SENDER:  Ok then he do you for 10 after you done

15

COMPLAINANT:  Ok

SENDER:  He jus cursed me out I told him it wasn't right!

COMPLAINANT:  Ok

SENDER:  He said the balcony door open try your screen

SENDER:  He said tell you be very quiet or close your door

COMPLAINANT:  I'm going to call my dad and say you was going to send pictures of me and you and Field day and they wasn't coming through so you was going to send them to hem so I can get them but you deleted them

SENDER:  Make him nut

COMPLAINANT:  What

COMPLAINANT:  We did it

COMPLAINANT:  He did me for 2 minute

COMPLAINANT:  Now is it over

COMPLAINANT:  Hello

COMPLAINANT:  Hello

SENDER:  Did he nut?  Don't lie cuz I asked him

SENDER:  It's over after he nut that's what I said

SENDER:  I promise

SENDER:  I think you think I'm playin.

SENDER:  It's ok ima call ▓    then text him the pic

COMPLAINANT:  I'm going again because it didn't nit the first time

SENDER:  I told you make him nut and it's over.  I told him the same thing!  Did he tell you what you were supposed to do

SENDER:  He will take a picture after the nut so I know you did it this time

16

SENDER:  Play with me and watch I send this to daddy

COMPLAINANT:  Ok

SENDER:  I'm not playing and he gotta do it again for 2 more minutes

COMPLAINANT:  Ok he putting my sister to sleep then I'm going to make it nut

SENDER:  You better

COMPLAINANT:  Ok

SENDER:  When he did the 2 min how it feel

COMPLAINANT:  Ok

SENDER:  That was a question

COMPLAINANT:  It felt ok

SENDER:  Wer you wet

SENDER:  Is he big

COMPLAINANT:  Why

SENDER:  Just asking

COMPLAINANT:  I don't know I just pulled my pants up

COMPLAINANT:  And yes

SENDER:  Yes what

COMPLAINANT:  It was big

SENDER:  Nice. Try not to chokr

SENDER:  It's almost 12

COMPLAINANT:  I know she almost asleep

COMPLAINANT:  And what happens at 12

SENDER:  Ok

17

COMPLAINANT:  What happens at12

SENDER:  I'm sending everything to j███ n m█

COMPLAINANT:  Ok

SENDER:  So he better nut n then do my 2 minutes

COMPLAINANT:  Sd is putting s to sleep □

SENDER:  Ok

COMPLAINANT:  How long do it take to nut

SENDER:  12:30

COMPLAINANT:  12:30 what

SENDER:  Like 2 minutes

SENDER:  I'm sending

SENDER:  What's goin on

COMPLAINANT:  I'm still doing it it's almost done

SENDER:  Hello

SENDER:  I zoomed in on the picture and guess what I saw

COMPLAINANT:  It nut and it made my pussy wet □now plz leave me alone

COMPLAINANT:  What did you see

SENDER:  The picture he sent that is spit! I suck dick and I know what but look like

COMPLAINANT:  What that mean

SENDER:  So make him nut! He gotta put the tip in and buy before 12:30 or j███

SENDER:  I know what nut look like.  That was spit

COMPLAINANT:  Ok

SENDER:  He know what to do already don't worry

18

<u>SENDER</u>:  Hello

<u>SENDER</u>:  10 min

 <u>COMPLAINANT</u>:  Can I do something else I got a headache and I don't feel good now plz I asking what did I do to have to do all of this

<u>SENDER</u>:  Nope 10 minutes

 <u>COMPLAINANT</u>:  What did I do

<u>SENDER</u>:  Ask ▮ at 12:30

<u>SENDER</u>:  Let him do it

 <u>COMPLAINANT</u>:  Do what

<u>SENDER</u>:  Do sd let the tip in

<u>SENDER</u>:  8 minutes

<u>SENDER</u>:  7 minutes

 <u>COMPLAINANT</u>:  Why do you want me to do this so bad

<u>SENDER</u>:  Do it

<u>SENDER</u>:  Time almost up

<u>SENDER</u>:  Sd ain't put tip in

<u>SENDER</u>:  Ok nvm ima call ▮ and yu on 3way

<u>SENDER</u>:  Sad begged me but nah

<u>SENDER</u>:  Sd

<u>SENDER</u>:  He put tip in and nut on floor when he done

 <u>COMPLAINANT</u>:  Plz donate I'm in pan right now I can't take no more

 <u>COMPLAINANT</u>:  You don't know my pan

<u>SENDER</u>:  Ok bout to txt him and m▮

19

COMPLAINANT:  No

SENDER:  Do it then sd keep telling me leave you alone but you gotta make it nut first

SENDER:  So what's it gonna be with 2 minutes left

SENDER:  Yu need more time

COMPLAINANT:  Yes

SENDER:  Ok

SENDER:  What time then

SENDER:  1:00am

COMPLAINANT:  11:00pm

SENDER:  1am

COMPLAINANT:  Ok

COMPLAINANT:  I need more time than that I need to sleep on it I'm crying right now

SENDER:  I'll text yu at 12:55

SENDER:  1am

SENDER:  Watch me text █

SENDER:  I'll send it to m█ later

SENDER:  Ok and I have it ready to send

SENDER:  Wat you gonna do

COMPLAINANT:  Can I at least sleep

SENDER:  See yu at 12:55

COMPLAINANT:  Can I go to sleep that's all I asking

SENDER:  Ok no reply.  Here goes the send button

COMPLAINANT:  No

SENDER:  Sd begged me to stop.  I told him what needs to be done

COMPLAINANT:  I did it and it didn't but

COMPLAINANT:  Nut

SENDER:  You lyin

COMPLAINANT:  I'm no it didn't but

SENDER:  It's ok watch this

COMPLAINANT:  Nut

COMPLAINANT:  It didn't but

COMPLAINANT:  Nut

SENDER:  I have sex so yu lyin

SENDER:  Lol nice

SENDER:  Your dad knows me so don't tell him nuthn or I'll sen

COMPLAINANT:  I did it and it did not nut

SENDER:  I told him who I was

COMPLAINANT:  Omg

SENDER:  14 minutes

SENDER:  Then m█ n ██

COMPLAINANT:  Can you just send it to my mom

COMPLAINANT:  So I can get in trouble and get it over with

SENDER:  Send a pic of you suckin sd dick to mom.  No yu might have her phone and block me! I was a child once lol

SENDER:  Nope your father and uncle getting these at 1:00am

21

SENDER:  I'll text you in 10 min

COMPLAINANT:  I did she have her phone in the room with her in her bed she don't let me see her phone

SENDER:  Don't text me unless you're done

COMPLAINANT:  Ok I'm doing it

COMPLAINANT:  And I forgot what's your name

SENDER:  Let me see while yu do it

SENDER:  Send a video now

SENDER:  Yu can txt n do dat lol nice try

COMPLAINANT:  I'm going to send a picture when I'm done

SENDER:  Nop

COMPLAINANT:  We I the dark

SENDER:  Record it then

SENDER:  12:55

COMPLAINANT:  Ok

SENDER:  Use flash

SENDER:  Where is it

COMPLAINANT:  I'm recording

SENDER:  6 minutes

14.      In addition, the preliminary forensic examination of the complaint's cellular telephone revealed a series of text messages that YOUNG sent to the complainant from the Device regarding the sexual acts that the complainant performed upon YOUNG.  YOUNG was

saved in the complainant's phone as "King,"[5] with a phone number of ███████████.
Specifically, the following text message exchange ensued:

> COMPLAINANT:  She got my uncle number and my dad number

> YOUNG:  She said that

> COMPLAINANT:  Yes

> YOUNG:  Ok make sure you erase

> YOUNG:  What she talkin bout

> COMPLAINANT:  I didn't look but she said that was the last thing what we did in the bathroom

> YOUNG:  She told me 1 more thing.

> YOUNG:  I'm begging her to leave you alone

> COMPLAINANT:  I told her no I'm sleepy but she don't know that I block her number on my mom phone don't tell her

> YOUNG:  Oh ok lol

> YOUNG:  So you ready

> YOUNG:  And plus she have a new number remember

> YOUNG:  She might not be lyin

> COMPLAINANT:  No I'm sleepy I'm begging her just to send them to my mom and get it over with and I put her new number in my mom phone and blocked it

> YOUNG:  She got our pic.  Don't tell her just send it!  Just do wat she want then we block her

> YOUNG:  You know the trouble you will be in

> COMPLAINANT:  Yes

---

[5] "King" is a nickname by which complainant calls YOUNG

COMPLAINANT:  No

YOUNG:  Ok so why wud yu say jus send it silly

YOUNG:  Huh

COMPLAINANT:  My mom coming out there

YOUNG:  So am I doin it or you

YOUNG:  Jus wana get it over with

COMPLAINANT:  Hold on and when did I say just send it silly

YOUNG:  She said you tol her send it

COMPLAINANT:  Send what

YOUNG:  Our pic

YOUNG:  She erased all yours

COMPLAINANT:  No I didn't

YOUNG:  So wana get it over with and go to bed.

COMPLAINANT:  No

YOUNG:  Ok so wat yu gon tell her

YOUNG:  I told her ima help you

COMPLAINANT:  Who my mom

YOUNG:  No the girl

COMPLAINANT:  I don't know yet

YOUNG:  Hurry up n let me kno. I'm ready or waiting

COMPLAINANT:  Ok

YOUNG:  A

COMPLAINANT:  She texting my mom but she doing know it's me texting her Imani got her phone

YOUNG:  Oh ok.

YOUNG:  So are we getting this over with or wat

YOUNG:  I'm ready to jus get it over with… I'll do everything you don't have to do nuthn

COMPLAINANT:  No

YOUNG:  So wat you gon tell her

YOUNG:  She sent a screenshot of m█ askin her who is this

YOUNG:  I erased it

COMPLAINANT:  I told her I'll do it

YOUNG:  Do wat

COMPLAINANT:  Do what she said

YOUNG:  Want me to or wat

YOUNG:  I'll do anything to help you out

COMPLAINANT:  I'll do what we did in the bathroom for 20 second

COMPLAINANT:  Seconds

YOUNG:  Ok

COMPLAINANT:  In the bathroom or living room

YOUNG:  Wat she doin her room

COMPLAINANT:  My mom

YOUNG:  Yea

COMPLAINANT:  Laying down

YOUNG:  ok

25

YOUNG:  Wait till I go out there

    COMPLAINANT:  Go in the living room

YOUNG:  Cut yur bathroom light on then close the door n come n here

YOUNG:  Erase

    COMPLAINANT:  Ok

    COMPLAINANT:  What about ▮

YOUNG:  Tell her you be back

    COMPLAINANT:  Ok

    COMPLAINANT:  I'm in the bathroom

YOUNG:  Act like you using it and close the door but come out and leave it on

YOUNG:  Check on mani first

YOUNG:  How yu kno how to do dat

YOUNG:  Omg

    COMPLAINANT:  I don't

YOUNG:  Well that was Gud.

    COMPLAINANT:  Ok

YOUNG:  Yu gon be □ right

    COMPLAINANT:  Be right for what

YOUNG:  Quiet…?

    COMPLAINANT:  Quiet for what

YOUNG:  This

    COMPLAINANT:  I'm not going to say nothing

YOUNG:  Ok I won't either.  I have a question

26

COMPLAINANT:  What

YOUNG:  Wud yu do it again for me not her!

YOUNG:  I'll show yu how to

COMPLAINANT:  I'm sleepy and got a headache

YOUNG:  Now now just askin wud you

COMPLAINANT:  No  not really just did it to stay out of trouble

YOUNG:  Ok ☐☐

YOUNG:  Thank you. And you owe me a big favor for helpin yu

COMPLAINANT:  What

YOUNG:  Huh

COMPLAINANT:  What

YOUNG:  Yu are really Gud at it

COMPLAINANT:  No I don't want to I'm your step daughter

YOUNG:  Ok ☐☐

YOUNG:  Erase

COMPLAINANT:  The text

YOUNG:  Yes

COMPLAINANT:  Ok

COMPLAINANT:  Did you delete the pictures

YOUNG:  Yea I did

YOUNG:  Erase dis too

YOUNG:  Ok

COMPLAINANT:  Ok

27

YOUNG:  She ain't bothering yu is she

COMPLAINANT:  She said I got to do you for 30 seconds again

YOUNG:  Wat?

YOUNG:  ???

COMPLAINANT:  And she said after I do it you got to do me for

COMPLAINANT:  My door open

15.     On June 26, 2019, the complainant was forensically interviewed at the Children's Advocacy Center.  During the course of the forensic interview, the complainant disclosed she had performed fellatio on YOUNG two times.  The complainant explained that an unknown person had sent text messages to her phone, telling her that she had to suck her stepdad's "private part" or else she would get into trouble.  The unknown person had previously sent the complainant images purported to be the unknown sender performing sexual acts on the unknown sender's stepdad.  The unknown person told her that "she" would send pictures of the complainant to the complainant's mom, dad, and uncle unless the complainant participated in several sexual acts with her stepdad (YOUNG).  During her forensic interview, the complainant indicated that she did not know what pictures the unknown person was going to send.[6]  The complainant reported that she complied with the unknown person's demands.  The complainant reported that she first sucked her stepdad's "private part" in the bathroom.  The complainant reported that, later, her stepdad pulled her pants down and kissed her butt.  The complainant reported that she received additional threatening text messages from the unknown person, demanding that the complainant suck her stepdad's private part again.  The complainant

---

[6] In a later interview, the complainant clarified that she had sent an image of her private part to the unknown sender.

disclosed that YOUNG told the complainant that since he had helped the complainant by getting the unknown person to stop texting the complainant, the complainant owed him.  The complainant reported that she sucked her stepdad's private part a second time in the living room. The complainant reported that her stepdad asked the complainant to suck his private part a third time, but that she said no, and that her mother came out into the living room shortly thereafter.

16.     The complainant also reported that YOUNG took pictures of her while she was "sucking his private part."  The complainant indicated that the flash was on when YOUNG took these pictures.  The complainant indicated that YOUNG told her that he sent the pictures to the unknown person who had been texting both YOUNG and the complainant.  YOUNG told the complainant that he deleted the pictures.

17.     The complainant reported she has YOUNG's phone number stored in her cell phone contacts as "King."

18.     On June 26, 2019, detectives from MPD arrested YOUNG at 200 I Street, Southwest, Washington D.C., and seized the Device incident to arrest.  The Device is in the lawful custody of the MPD at 5002 Hayes Street, N.E. in the District of Columbia.

**TECHNICAL TERMS**

19.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data

29

storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

        2)    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

        3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

        b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via

radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.       A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

e.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

f.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the

structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

h.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

i.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

j.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

k.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

l.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

m.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-

hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

        n.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

        o.      Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

        20.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Device, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is

probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

a.      Individuals who engage in criminal activity, including violations of 18 United States Code, Sections 2422(b) and 2251(a), as well as 22 D.C. Code Section 3008 use digital devices, like the Device, to access websites to facilitate illegal activity and to communicate with victims, witnesses, and co-conspirators online; to store on digital devices, like the Device, documents, photographs, recordings, messages, and other records relating to their illegal activity, which can include logs of online chats; email correspondence and correspondence through other applications; text or other "Short Message Service" ("SMS") messages; contact information of victims, witnesses, and other co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; names, addresses, telephone numbers, and social security numbers of other individuals; records of internet searches and Web History browers; I.P.addresses; and other means used in furtherance of these crimes as stated above, incorporated by reference here.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device

such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

21.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

39

f.      I know that when an individual uses a digital device to coerce another individual into engaging in sexual activity, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

22.      Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that

40

are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file

41

contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before

42

examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

    f.  Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

23.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.     The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the

44

Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## **AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

24.    Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

25.    I submit that this affidavit supports probable cause for a warrant to search the DEVICE described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____

Special Agent Alix Skelton
FBI/WFO/CR18
Child Exploitation and Human Trafficking

Subscribed and sworn to before me on this _____day of July, 2019:

_____

UNITED STATES MAGISTRATE JUDGE

45